## Adams's Estate.

*Wills—Issue devisavit vel non—Undue influence—Refusal of issue.*

An issue devisavit vel non will not be granted where the evidence shows that the contestant was a half brother of the testatrix, with whom she had no associations for twenty years, and the beneficiary was a friend with whom testatrix had boarded for many years; that testatrix was of full mental capacity; that a son of the beneficiary, a physician, whose advice in the one business matter as to which she had consulted him she had rejected, had written the will for her, without any persuasion on his part or that of his mother; that years before, testatrix had had a stranger write for her a will, naming the same beneficiary ; that after the last will was made testatrix retained it for some days, and on the very day of its execution she had declared to strangers her intention to execute it; that it was executed in the presence of the subscribing witnesses, one of whom was a mere acquaintance; and that during the years immediately preceding her death she had made repeated statements to strangers of her intention to dispose of her property in the way in which it was disposed of by the will.

Argued Jan. 7, 1902. Appeal, No. 165, Jan. T., 1901, from decree of O. C. Phila. Co., July T., 1900, No. 112, dismissing appeal from register of wills in the Estate of Emily E. Adams, Deceased. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Appeal from register of wills.

Penrose, J., filed the following opinion :

The petition for appeal, filed October 2, 1900, sets forth the decedent died February 24, 1900; that her will executed February 22, 1900, was admitted to probate June 9, 1900 ; that at the time of its execution the decedent was not of sound disposing mind, memory or understanding, or capable of making a valid will; that it was procured by undue influence exercised by Dr. Clarence Clewell and others; and that the decedent, who was unmarried, having left no issue, father, mother or brother, or sister of the whole blood, the petitioner, a brother of the half blood, is entitled to her estate, real and personal, under the intestate laws.

The evidence failed to show either want of testamentary capacity or the exercise of undue influence.

For more than twenty years preceding her death, the decedent, who was an unmarried woman, resided with Mrs. Catherine Clewell, whose mother and hers had been intimate friends. She paid a small board ($3.00 per week), but was in every respect regarded, both by herself and the others who constituted it, as a member of the family, which consisted of Mr. and Mrs. Clewell, their son, Clarence, another boarder (a connection by marriage), Mr. Read, and the decedent. At a date not shown, her mother had died, and for a short time the decedent boarded with her half-brother, Daniel H. Adams; but for some reason she saw fit to leave his house, and she and an aunt then went to Mrs. Clewell's.

In the course of a year or two, the aunt died, and her estate passed to the decedent. She suffered from some muscular trouble which made her walk with difficulty, so that she seldom, if ever, went out of the house unaccompanied. The trouble extended also to her hand, interfering with her ability to write, though she could, with much effort, sign her name.

Her property, including that which she acquired from her aunt, consisted of shares of stock in the Girard Trust Company, in which company she also kept her bank account. She became, as the testimony shows, very fond of Mrs. Clewell, whom she often spoke of as her mother. The value of her estate was said to be about $9,000.

Not long after the death of the aunt, she asked Mrs. Clewell one day to accompany her to the Girard Trust Company office, telling her that she intended to execute a will giving her all her estate. Mrs. Clewell objected to this and said it should be given to the half-brother, Mr. Adams. She persisted, however, in having her original intentions carried out, and, accordingly, the two went to the office of the company, where, in the presence of Mrs. Clewell, she dictated a will in her favor to Mr. Tatnall, an officer of the company, by whom it was drafted. This will was duly executed by her and left in the custody of the company, where it remained for many years, the decedent often referring to its existence and to the fact that she had left all that she owned to Mrs. Clewell.

From the time that she left the house of her half-brother until her death, he did not call upon her, nor did she upon him, nor did they see each other, though in the summer or fall

preceding her death, as will presently be stated, she made inquiry for him and subsequently was visited by his daughter, Mrs. Catherine E. Kalbach. Her health appears to have been good until a very short time before her death, but its failure then was rapid. The symptoms appear to have been loss of appetite, derangement of the digestive system, and great and increasing physical weakness, a condition which Dr. Clarence H. Clewell, who has been a practising physician for about six and a half years, attributed to old age, and Dr. John D. Moore, who was called in as a consulting physician, to inanition.

She was not over seventy at the time of her death, and, by whatever name the cause may be designated, the uncontradicted testimony was that it was one which did not in her case or generally, lead to an impairment of the mental powers.

On February 13, 1900, she asked Dr. Clewell to tell her how she was. He replied that she was not then in any serious condition, but that it might probably be her last illness, and asked her, " if she had all her matters straightened out." She said yes, she had a will. What then took place is thus narrated by Dr. Clewell : " I said : ' Emily, hadn't you better get it and see that everything is all right ? ' She said, ' Yes,' and directed me where to look for it. I looked for it and could not find it. I made further search, searched down through the bureau, and still could not find it. She said in a sort of soliloquy to herself : ' I wonder if I could have destoyed that among other papers.' I still looked for it, and I could not find it. I asked her if she thought where else it might be found. She said no ; to make a new one. I told her no, she could get a lawyer to do that. She said no, anyone could draw a will. I said, ' Whom do you want it to go to ? ' She said, ' My mother.' I said, ' Don't you want your relatives—' before I could get it out of my mouth—' I don't want anything to do with my relatives.' I said, ' Don't you want your half-brother to share it,' and she said, ' I don't want him to have anything.' I said, ' Whom do you want to settle up your things ? ' She said, ' I want the Girard Trust Company to attend to my affairs and settle up my estate.' This was in her bedroom, at 2410 Oxford street."

The witness left the room and went to his office, which was in the same house, where he wrote the will in accordance with

these instructions; then took it to her, and after reading it aloud, left it with her. She said she " would think it over," and placed it under her pillow. Nine days later, viz : February 22, 1900, the will so drawn was executed. Dr. Clewell thus testifies : " That it was in the morning of the 22d. She wanted to know how she was. By that time I think she saw she was not going to get well, herself. I told her positively then. I said : ' Emily, in my judgment, it is beyond possibility to recover—for you to get well.' I said, ' If there is anything you want me to do for you, you had better tell me now before it gets too late.' This was about 11 o'clock in the morning. She thought a bit and said : ' Well, I want to sign my will.' That is about all."

Dr. John D. Moore, who was called in consultation, reached the house about 2 o'clock of the same day (February 22), and having concurred in the opinion of Dr. Clewell that the decedent would not recover, was asked by Dr. Clewell to be a subscribing witness. The conversation occurred in the office of the latter, and Dr. Moore having assented, Dr. Clewell returned to the room of the decedent and asked her if she was ready to sign the will, which she then handed to him. He took it, and having brought Dr. Moore from the office to the room, and having also requested Mr. Read to be a witness, in their presence and in the presence of his mother, Mrs. Clewell, whom he had also summoned, read it to the decedent, asking her " if that was right? " She assented either by nodding her head or by answering yes, or perhaps by both. In view of the difficulty with which she could sign her name, Dr. Clewell told her that her mark would be sufficient, and after he had written " Emily E. Adams " and " her mark," she made the mark in the place left for it, and Dr. Moore and Mr. Read signed their names as witnesses.

The paper remained on the table in her room until her death, which occurred two days later (February 24, 1900).

No witness on part of the contestant saw the decedent after the middle or latter part of December, 1899, and they all admitted that at that time her mind was vigorous and unimpaired ; but the evidence relied on to sustain the allegations of the petition was, substantially, as follows : Maria T. Amrock, who had become acquainted with her from having lived as a domestic

in a family of whom the decedent's aunt was a visitor, testified that she had visited the decedent about three years before her death; that the decedent then told her that something unpleasant had occurred between her and the family, and that she had taken the will from the Trust with the intention of destroying it. What the unpleasant thing was, was set forth in a note or memorandum which was then handed to the witness with the request that it should not be read until she reached her own home, as the decedent " did not want the folks in the house to hear us." A few days afterwards the witness saw her, and when asked whether she could get her a boarding place, replied that she did not know, but would find out. The note or memorandum referred to was as follows: " I cannot say anything before Mrs. C., but Sunday morning Mr. C. called, and I guess he forgot to call me. So when I came down the breakfast was all cleared except mine. I think it was a put up job. So when Harry came down I told him his father forgot to call me. He told his father about it. He said he did. So when I was down to help clear the table, I said to Mrs. C. that Mr. C. forgot to call me. She said I had better not let Mr. C. hear you say that. So I told her that I had better get another place to board. She said I had better. I don't feel satisfied, so if you hear of a private family, I wish let me know. Yours truly, Emily.

" I don't wish to go into a boarding house. Excuse bad writing. I am nervous."

This paper bore no date, but Mr. Rettew stated that it "was over three years before her death."

It is undoubtedly a fact that some years before her death the decedent received from the Girard Trust Company the will drawn by Mr. Tatnall, which had been left there for safekeeping; but as Maria T. Amrock admitted that as late as December, 1899—three years after the unpleasant occurrence referred to in the note—the decedent had told her she had not yet time nor opportunity to destroy the will, it is pretty evident that this foolish little quarrel, as a reason for change of testatrix's intention, had quite passed out of recollection. There was a subsequent misunderstanding, however, which, on its face seemed of a much more serious character: On August 16, 1899, Miss Annie Thompson, an acquaintance of many years'

standing, called to see the decedent, who was very "nervous,
. . . . and she said that something had happened, that she
could not stay there," though she did not state what it was,
but requested that Maria T. Amrock be asked to come to her;
and Maria having, in response to the message thus sent, called,
was told by the decedent that she was not happy there now any
more; that she wanted me to find her a boarding place, . . . .
that she would like me to find her niece, and by going to her
brother's I would find out where that niece lived, . . . . that
she would not stay there any more; that something had hap-
pened; that she was unhappy; and she said it was in reference
to her money affairs that Mrs. Clewell wanted her to sign a
paper, or wanted her to buy some stock with some money that
was over . . . . stock, with the money that was over in the
Trust. She did not want any more stock. Then Mrs. Clewell
wanted her to buy it and make it over to her, she told me, and
she would not do it. Also she said that Dr. Clewell came up
to her room and wanted her to sign some papers, and she de-
clined to sign them; said she wouldn't sign them; and Dr.
Clewell said if she would not sign papers that he would not
get any more checks cashed for her, and she said all right, she
would get somebody else." She then told Maria to find out
where her brother Daniel lived and have his daughter, her niece,
come to her, and said if "he was living and not able to work,"
she would give him money. The result of this was that the
niece, Mrs. Catherine E. Kalbach, who had not seen her for
many years, called upon the decedent, who seems to have re-
peated to her what she had thus stated to Maria T. Amrock,
and it was arranged that she should leave Mrs. Clewell's and
board with her niece. This was in September, 1899, or in the
early part of October; but in December, a week before Christ-
mas, Maria saw her again and was told "that she was going
to leave in the spring, and that she had not destroyed the will,
and she said she was going to do it, and she would see that
that was all right." All of this is fully explained. In the
latter part of July, 1899, the Girard Trust Company determined
to increase its capital stock from $1,000,000 to $2,000,000 by
the issue of 10,000 shares of new stock; the privilege of taking
the new stock, at the price of $350 per share, to be given
to the present stockholders, at the rate of one new share for
every share held. The decedent was the owner of seventeen

shares of the stock, and notice of this action of the company was sent to her July 31, 1899. The notice was quite a lengthy document. It contains a statement that stockholders not wishing to subscribe could sell the right, "in which case the transfer and power of attorney may be filled in for the amount so disposed of, . . . . the right to purchase new stock as above stated is transferable until October 2, 1899, after which date transfers can only be made when the instalments have been paid."

This notice was not understood by the decedent, who showed it to Dr. Clewell. He explained it, and when she said that she had no money to pay for new stock, told her she could sell the privilege. She did not care to do this, and he, supposing that it could not have much value, said no more on the subject. At a later date he happened to see that sales of privileges had been sold at auction for over $100 per share. Then he urged her to sell, and for this purpose to sign the power of attorney sent by the company. Still not understanding the business, she refused, evidently thinking Dr. Clewell's urgency had some sinister motive. It was at this stage of the matter that Miss Annie Thompson, and afterward Maria T. Amrock and Mrs. Kalbach saw her. Her refusal and evident suspicions had incensed Dr. Clewell, who told her that thereafter he would attend to nothing for her. But in October, the company wrote to her again, calling her attention to her failure to reply to the former notice. Still she did nothing, and a third letter was written asking her to come to the office of the company. Then, accompanied by Mrs. Clewell, she went to the office and found that by signing the power of attorney she would be able to realize for the privilege of subscribing to the new stock more than $2,000. She then executed the necessary papers and received in return $2,260; and when she returned home and saw Dr. Clewell she expressed great regret for the way she had acted toward him. This all took place in the interval between the visits of Maria Amrock and Mrs. Kalbach in September, when it was arranged that the decedent should go to board with the latter, and the final visits in December, when she said she would not "change before spring," though apparently she did not see fit to explain to these ladies what had caused her to change her plans. There is strong affirmative evidence in support of the will, but it is unnecessary to refer to it, since

there is nothing in the testimony of the contestant that would justify a verdict against its validity.

It was suggested that Dr. Clewell was the confidential adviser of the decedent, and for that reason, and also because he was her attending physician, the burden of proving the absence of undue influence and the existence of testamentary capacity was upon him—the sufficiency of the proof offered being, of course, for a jury. But there was no evidence to justify the assertion that he was the "confidential adviser," or that he stood toward her in any confidential or fiduciary relation whatever. All that he did was to go to the trust company to have her checks cashed occasionally, and in one or two instances, at her request, look over some old papers for her. It is true that he speaks of himself as her "attending physician," but she had lived with his mother, while he was still a boy and young man during the fourteen years which preceded his becoming a physician, and in the six years which followed, it does not appear that she was at any time in need of medical services until the illness which occasioned her death, beginning almost at the very time the will was drawn. There is not the slightest reason to suppose that the decedent was induced by the existence of any such relation to execute the will, from which he derived no benefit, which gave to his mother precisely what the previous will, drawn by a stranger, had given her. The case bears no resemblance to Cuthbertson's Appeal, Baugh's Estate, etc., cited by Mr. Rettew on behalf of the contestant.

Without going further into the details of the case, it is enough to say that there is no sufficient evidence in support of either of the averments of the petition—testamentary incapacity or undue influence. The issue asked for must be refused and the appeal dismissed.

*Error assigned* was the decree of the court, dismissing the appeal.

*Ruby R. Vale*, with him *J. Barton Rettew*, for appellant.

*A. H. Wintersteen*, for appellee, was not heard.

PER CURIAM, February 24, 1902 :

The decree in this case is affirmed on Judge PENROSE'S opinion.